et al., Case No. 25-1028. Good morning, Your Honors. May it please the Court, James Brewer for the Appellant, Dr. Ram Gopal, I'd like to reserve four minutes for rebuttal. Yes. The District Court should have denied defendant's motion for summary judgment because the defendant's and two, require resolutions of issues of fact that are only appropriate for the jury. Furthermore, the District Court improperly usurped the jury's role as determiner of fact with respect to constructive discharge, discriminatory inference, not intent, as the District Court noted, pretext, and further, the defendants are not entitled to qualified immunity because the plaintiff's Title VII claims should prevail in the same ways as equal protection claims against the individual defendants, something that was not addressed by the District Court. Because of these errors, it is respectfully submitted that the case be reversed and remanded. This Court should take note of key facts that are best for the defendants. What evidence is there in the record that the plaintiff's race was a motivating factor in the university's decisions? There's a couple, a few things, Your Honor. One was that others that were similarly situated were not treated in the same way. We listed those, the five comparators, all white, all involved in the same travel policy issues. And another ---- Were any of those five accused of violating the amorous policy? No, Judge. And if I could speak on that, the amorous relationship policy does not have any definition of a penalty other than that it should be disclosed. It should be disclosed, and when it is, that any conflict that cannot be remedied, the result would be to move the superior from the subordinate reporting to him or her. There's no penalty involved in that. And the record also is replete with documentation that this is a very convoluted, confused, and not necessarily applied policy. Did he violate the policy? I say no, Your Honor. You can't violate a policy, Judge, if you don't know what it is. And you can't discipline somebody based on a policy if you can't articulate what it is. And that's the case here, Judge. Well, I'm puzzled because he said, beyond the few instant messages, I did not violate any university policy, which suggests that he understood that the few instant messages violated university policy. Well, that may be what Dr. Capel said in an offhand remark during his deposition, but the record is also clear that he never admitted throughout this process that he violated the policy. He said, and the defendants made this point in their brief, I regret sending the e-mails and the texts. Certainly he does, Your Honor. That's not the same as making an admission. There's no dispute that he wrote those e-mails and engaged in those e-mail conversations, right? No, not at all, Judge. Our argument is not that these e-mails existed. The plaintiff and as well as the subordinate both throughout the investigation said that these were fantasy, that they were, you know, fooling around. She wound up asserting a claim of sexual harassment against him. She made that, and the defendants rely on this, Judge, but the deciders on the termination did not. The defendants rely on that post-disciplinary decision by UConn, and at that point, Ms. Burke says, well, you know what, I'm going to claim that the university So back to my initial question. I asked you what evidence there was that race was a factor. You said the five comparators. What else is there in the record to suggest that race was a motivating factor? There's malice or animus, I guess, is a better way to put it, Your Honor. Dr. Cappell, when he asked if he could resign, was told, no, you have to resign two days before you would be eligible for your 25-year pension. They also misled him. What's that got to do with race? Well, it shows that they had an animus against him, Your Honor. What's that got to do with race? It's not on point, but I think the case law is very clear. At this point, at summary judgment, the issue is not intent, it's an inference. And the inference is clear based upon the totality of these circumstances. But on what basis could a jury draw the inference that that animus, assuming there was animus, was because of his race? Because he's treated differently than the other white employees, Your Honor. And that's enough in your opinion? At this point, yes, Judge. And I want to emphasize that we can all probably agree, you know, the case might not be successful with a fact finder. But that's not the district court's role here. You know, there's a lot of evidence. Obviously, the record is replete. It's a very well-documented case. A lot of the issues that are argued here are factually disputed. What evidence is there that the university's stated reasons were pretextual? Then we go back to the fact that the comparators were treated differently. That's one. And that they really can't honestly rely on either the travel policy or the amorous relationship policy to terminate my client. They've never, in addition, when we talk about animus. Was any comparator accused of violating the three different matters, amorous relationships, travel?  Yes. Yes and no, Judge. The record indicates, Dean Elliott testified, that they changed this all up regarding the travel policy. They didn't want to. Was there any other comparator who was accused of violating all three policies?  Not accused, Judge. No. So why isn't that? I mean, you're relying a lot on the comparators. Yes, Your Honor. So why doesn't your answer just now to just chin? I couldn't hear you, Judge. Why doesn't your answer just now to just chin end your reliance or undermine your reliance on the comparators? Because the best case, I think, is Mr. Reynolds. And not even he is really a comparator. And so once you tell us that there is no comparator quite like your client, and I appreciate the candor, then why should we view this as a comparator-based discrimination case as opposed to something else? Because at this point, Your Honor, there's so many facts that are in dispute that the district court's determined regarding that issue among others. What the comparator? No, no, no. You just told us, I'm sorry. You just told us that there really is no comparator that's quite like your client. And what we've required is quite like the plaintiff. Well, respectfully, Your Honor, my understanding is that an identical comparison isn't required similarly. And what our argument is based upon is if we look at the travel policy alone, then all the comparators remain. The fact that our argument is that the amorous relationship policy, right, should not have been used as a basis for termination. It was bootstrapped into, well, because you had this amorous relationship, you decided or we decided that your travel policy violations, which a number of other people, it's in the record, were in violation of or had improperly used, were also given a pass. So the reason why Dr. Capel was terminated was not because of the travel policy. That's what Dean Elliott testified to. It was because, oh, well, he had an amorous relationship. And then we go back to my initial argument, Your Honor. That policy is defective. That policy should not be a basis to terminate anyone. Even if it ultimately was used as a morals clause.  Right. You've reserved quite a bit of time for rebuttal. Yes. Thank you, Your Honor. Good morning. May it please the Court. I am Assistant Attorney General Laura Vitale, and I represent. Could you keep your voice up, please? Of course. My apologies. And I represent the defendants. The trial court properly granted defendants' motion for summary judgment, and this court should affirm. There was no adverse employment action. The only adverse employment action on appeal is the alleged constructive discharge. But the undisputed facts show this was not a constructive discharge. And so the court properly granted defendants' motion for summary judgment on that basis alone. Even then, Your Honors, plaintiff failed to set forth a prima facie case because there is no evidence connecting any adverse employment action to his race. Now, a constructive discharge requires intolerable working conditions that are designed to coerce the employee to resign. But UConn did not create intolerable working conditions for the plaintiff. There was no coercion. Wasn't it pretty clear that he was about to be terminated? I would say that is correct, Your Honor, that the plaintiff believed he was about to be terminated and that most people would want to— Wasn't he about to be terminated? That—well, so that's an interesting question, Your Honor, because— I mean, couldn't a jury find that he was about to be terminated and he was forced to resign? I think that a jury could find that he was about to be terminated, but— Why don't you move on to the other issues? Oh, absolutely. Yeah. So, okay. Because even assuming a jury could find a constructive discharge, you've got other arguments that perhaps are better. I'm happy to move on, Your Honor. Okay. So now the only basis for—so there are no similarly situated comparatives. Joseph Reynolds is not similarly situated in all material respects. First, he was an adjunct faculty. Plaintiff was a department head. A key distinction between the two here is that Joseph Reynolds resigned earlier in the process. So defendant treated both Joseph Reynolds and plaintiff the same. They were both placed on administrative leave. They were both investigated for alleged violations of policy. Joseph Reynolds resigned before there was an investigation or a determination substantiating the investigation. Was he accused of any travel or timekeeping violations? No, Your Honor, and he also was not accused of multiple violations or abusive authority the way that plaintiff was. So Joseph Reynolds is not similarly situated. What about the five comparatives, the other five? And similarly, the other comparatives are not similarly situated because they are not department heads who had an amorous relationship with their subordinate and then used State funds to further that relationship with their subordinate. It's just not even remotely the same. Plaintiff refers to their involvement in approving travel, but the department head is the one who requested and pursued that travel to further his relationship with his subordinate. So you just really can't compare those situations. Let me ask something. You mentioned that Mr. Reynolds was an adjunct professor. Does that, what, he's a professor technically. He's paid by the University of Connecticut to teach. Does that make a difference in terms of the assessment of whether he's an adequate comparator? I certainly don't think it rises and falls on that distinction, Your Honor. It's simply just another factor that shows that they're different, an adjunct faculty member as opposed to a department head who has more authority. I thought that the argument, the gist of the argument was that he was, he was up in, he was permitted to reside in good standing, right? Is there any other thing that differentiates Mr. Reynolds from the plaintiff here? So, in addition, the person who accepted. So to the extent there's a, you know, plaintiff is making an issue out of the resignation in good standing versus the resignation not in good standing. So a different person accepted the resignation. So Dean Glassberg accepted Joseph Reynolds' resignation, and in that email said, you know, I wish you the best in your future endeavors. Different email style, I guess. Joseph Reynolds, again, resigned before there was, it was the day before, but it was before there was a substantiated investigation. Because he's covered by the collective bargaining agreement under Article 26, I think it makes perfect sense that UConn wouldn't attach a not in good standing qualifier to someone who resigned before there was technically a found violation. Now, as far as counsel mentioned, that the resignation two days before he had a certain number of years, I guess, was evidence of animus, if I understood correctly. Your Honor, allowing, so UConn did not have to allow plaintiff to resign. That was actually a courtesy. And so the fact that UConn allowed plaintiff to resign, if anything goes against a finding of animus, and again, there is absolutely nothing that connects UConn's actions to plaintiff's race. Now, for the 1983 claim, Your Honor, the Court properly granted defendant's motion for summary judgment on the 1983 claims as well for the same reasons. Now, the defendants, the only defendants that plaintiff is pursuing on appeal for the 1983 claims are Provost Kennedy and Dean Elliott. Plaintiff has abandoned his claims against the other three individual defendants. And, you know, even beyond what we've already talked about, the issues with the Title VII claim, here, you know, the 1983 claim is even more problematic. The defendants have qualified immunity. Even if the Court were to find, you know, that there could be a constructive discharge here, and again, I respectfully disagree, but at the very least, the law was not clear, sufficiently clear, beyond debate that would notify Dean Elliott and Provost Kennedy that their actions in following, you know, the collective bargaining agreement process would somehow amount to a constructive discharge. Plaintiff has to show that each of the defendants personally held a discriminatory animus against the plaintiff and intentionally and purposely discriminated against him. Again, there is simply no evidence of that. And the similarly situated comparators, because of the differences between plaintiff situation and the employees that he seeks to compare us to, no reasonable jury could look at those comparators and conclude that plaintiff was discriminated against because of his race. So unless the Court has further questions, which I'd be happy to answer, I will otherwise rely on the brief. Thank you very much.  Mr. Brewer. Your Honor, I'll begin with a little rebuttal on the courtesy that was supposedly offered and supplied to Dr. Capel. This courtesy, as it's claimed, was forced, resignation date, two days prior to a significantly increased pension that Dr. Capel would have been the beneficiary of. To claim that there's nothing in the record that shows that that would be animus is inaccurate. Excuse me. In addition, why would any — I'm sorry. I didn't follow you. What's the reference? What's the relevance of the pension offense? Well, because, Your Honor, the claim is that, and I was going to next argue with regard to Green, is that Dr. Capel voluntarily or willfully entered into this resignation, and therefore it's not a constructive discharge. He didn't want that on his record. That's correct, Judge. And that's what my next point was. Well, they were doing him a favor, right? No, they're not, Judge, because when he did accept this resignation scheme, they duped him and they ended up widely publicizing that he — they duped him. They — They duped him. Right. They conned him. And they widely publicized, which is almost worse than a termination, I would argue is worse than a termination because it means that you agreed, in a way, that he was resigned not in good standing, a concept that was made on a whole plot only for him. That's factually correct, right? It's not. It's not supported, Your Honor. There's no — there's no standard at the University of Connecticut. If he was not resigned, he would be fired. And we've done an investigation and found out that you — you were involved in conduct which violates our regulations. Right. Well, in response to that, Your Honor, I refer to my previous remarks. The remedy for having an amorous relationship, as torrid as it may appear on the record, is still to remove the person out of the scheme. But the fact remains is that what Dr. Capel was trying to avoid, as the Court notes here, any bad reputation. So why — why would he resign not in good standing? And then you have to understand that the records also replete with the fact that the University of Connecticut, unlike with Professor Reynolds, widely publicized this resignation. It was worse than a termination. He was unable to get work, et cetera. So typically a resignation is done to — as the Court notes, to lessen the impact of your resignation, to maybe avoid some of the scandal. Right? So why would you willingly agree to a resignation that hurts you if you didn't have to? And why would you agree to diminish your pension unless you were forced to? And the record's clear on that. He was told — What does that have to do with race? Well, then we get back to how he's treated versus the persons that are not in his protected class, different color, et cetera. He was treated differently, Judge. And I think that the case law shows that at this point in the case, there is an inference of discrimination. And a jury could reasonably say, well, they're treating this guy, like, horribly, and they're going after him. Meanwhile, other people that have been involved, potentially even in amorous relationships, if — I would submit that if you did the kind of investigation — Isn't that sheer speculation? Yes, it is. To say that the other five might have been involved? There's nothing in the record in an amorous relationship? There's nothing in the record to suggest that. What's not speculation, respectfully, Your Honor, is that none of those — Is there anything in the record to suggest that any of the five was involved in an amorous relationship? No. But the reason why I point that out, Judge, is nobody — nobody in that record, right, none of these other comparators were subjected to the same kind of scrutiny that Dr. Capell was. This was not — you know, this started with an anonymous complaint, and then they did a full-scale sort of FBI, almost, examination of his background, digging up texts, et cetera, with this — with this employee. It's a different scrutiny. Mr. Brewer, this is at a time when universities are under attack. I understand. This is a very serious set of charges where you are paying a subordinate — you're using university funds to help a subordinate travel around the world. You're having an amorous relationship with that subordinate, and — On the university's dime. On the university's dime. And you're a department head, which I'm fully focused on. You're a department head. Right. And I appreciate the arguments. They're arguments, Judge. They're arguments, and I appreciate those. I don't — you've not really pointed to someone under the current environment who's quite similarly situated. Well, I think that one of the things I would point out, when counsel said that there's nobody else that was a department head, well, Dean Elliott is one of the comparators. Dean Elliott. Yeah. I mean, it's above a department head, right? So — but, you know, I make the argument, Judge, because, you know, I've obviously thought about this, meditated on this. It seems to me that this is really about a morality thing. It's not about whether or not — I'm sorry, it's about a what? It's a morality issue, Judge. Yeah. It's not about whether or not Professor — or Dr. Capell misused the travel policy, because Dean Elliott said he wouldn't have — But that undercuts — that undercuts your argument that it's race-based. It's about morality and morals, not about race. In that respect, Your Honor, in the respect about the morals clause being used, there's no component — I'm sorry, the amorous relationship clause. There's no component of the amorous relationship clause that addresses any discipline. And one of the things that the record shows is that the dean, Dean Elliott, Provost Kennedy said, well, we consider that to be serious misconduct. Well, I think that you have to provide some kind of notice, right, to the employees, that if you violate this policy, it would be serious misconduct. Now, I — Your Honor, that's a fact issue, right? I think that — I don't know if he knew that lines — and it depends on what the lines are, Your Honor. And that's the point we're making. I'm sorry. I understand. But misbehavior is not — Your Honor — This is not — and I'm glad you pointed that out, Your Honor, because that's what the inference is here. This had nothing to do with students. This had nothing to do with a sexual harassment complaint other than — I was making a somewhat different point. This is a university, and this man has a pedagogical function. Understood. And I'm the president. I'm the provost. It gets my attention. But, Judge, you know, we've all read the e-mails. They're absurd. They're what? They're absurd. They're silly. They're odd, right? But they don't necessarily violate, as stated and as applied, the amorous relationship policy. It's too vague. It's too ambiguous. None of these comparators or supervisors had a similar or consistent understanding of the amorous relationship policy.  They all made — they all made comments about how, oh, geez, I think it's when someone's having sex. Well, granted. But that's not what was found. We'll meditate on this. Okay. We'll reserve the decision. Thank you very much.  Thank you, Your Honor. Thank you, counsel. Well done. Well done. Oh, thank you. Appreciate it. Well done.